In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 18-1890 & 18-2261

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSE TRINIDAD GARCIA, JR., and
ALFONSO PINEDA-HERNANDEZ,
also known as Flaco,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:15CR00200 — **Jane Magnus-Stinson**, *Chief Judge.*

_____

ARGUED SEPTEMBER 20, 2019 — DECIDED JANUARY 22, 2020

_____

Before WOOD, *Chief Judge*, and MANION and ROVNER, *Circuit Judges*.

MANION, *Circuit Judge*. Police found over 80 grams of red methamphetamine in a car. The ensuing investigation—dubbed "Code Red"—lead to the indictment of 12 people for a drug-distribution conspiracy. Eleven, including Garcia, pleaded guilty. Garcia argues the judge improperly enhanced

his sentence based on a prior drug conviction. We agree with Garcia. Pineda-Hernandez alone stood trial. He claims multiple errors involving an alleged language-interpretation debacle. He also argues the judge improperly augmented his sentence based on his role. We disagree with Pineda-Hernandez.

## I. GARCIA

Pleading guilty, Garcia admitted he participated in or could have reasonably foreseen the distribution of about 3.5 kilograms of a mixture containing meth and at least 1 kilogram of heroin. As he admitted the conspiracy involved over 500 grams of a mixture containing meth, he faced a statutory range of 10 years to life in prison with no prior conviction for a "felony drug offense." 21 U.S.C. § 841(b)(1)(A)(viii).[1] But he faced a range of 20 years to life with one prior conviction for a "felony drug offense." *Id.* The government sought the 20-year minimum based on Garcia's conviction under Indiana Code § 35-48-4-10(a)(1) for an offense that occurred in March 2014. At that time, Indiana banned manufacturing or delivering "marijuana, hash oil, hashish, or salvia." (The crime was a felony because the recipient or intended recipient was under 18. I.C. 35-48-4-10(b)(1)(A).) The district judge imposed the 20-year mandatory minimum. Garcia appeals.

He concedes plain-error review applies as he failed to object below. But he argues the judge plainly erred by treating the prior conviction as a "felony drug offense" to enhance the sentence. Under plain-error review, Garcia must show "(1) an error occurred, (2) the error was plain, (3) it affected the defendant's substantial rights, and (4) it seriously affected the

---

[1] Each citation to a statute references the version in effect at the relevant time, unless otherwise noted.

fairness, integrity, or public reputation of the proceedings."
*United States v. Pierson*, 925 F.3d 913, 919 (7th Cir. 2019).

When Garcia committed the prior drug offense, Indiana's statute prohibited dealing in marijuana, hash oil, hashish, or salvia. Here is the text of the statute, arranged in columns:

> (a) A person who:
>
>> (1) knowingly or intentionally:
>>
>>> (A) manufactures;
>>>
>>> (B) finances the manufacture of;
>>>
>>> (C) delivers; or
>>>
>>> (D) finances the delivery of;
>>
>> marijuana, hash oil, hashish, or salvia, pure or adulterated …
>
> commits dealing in marijuana, hash oil, hashish, or salvia, a Class A misdemeanor, except …
>
> (b) The offense is:
>
>> (1) a Class D felony if:
>>
>>> (A) the recipient or intended recipient is under eighteen (18) years of age … .

I.C. 35-48-4-10.

The question is whether Garcia's prior conviction under this statute is a "felony drug offense" for purposes of the enhancement for his federal crime. Federal law defined "felony drug offense" as:

> an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances.

21 U.S.C. § 802(44). Federal law also defined these particular substances. "Narcotic drug" generally includes opium, opiates, poppy straw, coca leaves, cocaine, ecgonine, and any compound containing any of these substances. *Id.* § 802(17). "Marihuana" generally means all parts of Cannabis sativa L. and every compound of this plant. *Id.* § 802(16). "Anabolic steroid" generally means any drug or hormonal substance related to testosterone. *Id.* § 802(41)(A). "Depressant or stimulant substance" generally means a drug containing barbituric acid or amphetamine, or lysergic acid diethylamide, or any drug containing a substance the Attorney General designated as having a potential for abuse because of its depressant, stimulant, or hallucinogenic effect. *Id.* § 802(9). (Foreshadowing: "felony drug offense" includes marijuana but not salvia.)

Courts use the categorical approach to determine whether a conviction under a state statute meets § 802(44)'s definition of "felony drug offense." *United States v. Elder*, 900 F.3d 491, 497–501 (7th Cir. 2018). "The categorical approach focuses solely on whether the elements of the crime of conviction sufficiently match the elements of the crime referenced in the federal statute, while ignoring the particular facts of the case." *Id.* at 498 (internal quotation marks and brackets removed) (quoting *Mathis v. United States*, 136 S. Ct. 2243, 2248 (2016)). Under the categorical approach, Garcia's appeal is easy. The problem for the government is salvia. The Indiana statute plainly

prohibits it, but the federal definition of "felony drug offense" plainly does not include it. So the Indiana statute is broader than the federal definition. Indiana may convict a person for violating I.C. 35-48-4-10 even though he never dealt with a drug listed in the federal definition. Thus, under the categorical approach, a conviction under I.C. 35-48-4-10 is not a "felony drug offense" and cannot raise the mandatory minimum sentence for Garcia's instant federal crime.

The government concedes Indiana's statute includes salvia and concedes the federal definition of "felony drug offense" does not. The government essentially concedes I.C. 35-48-4-10 is overbroad under the categorical approach. But the government argues I.C. 35-48-4-10 is divisible, so the modified categorical approach applies. When a statute sets out alternative elements rather than merely alternative means, it is divisible, and courts use the modified categorical approach to determine which division formed the basis of the conviction. Here, if the statute's list of drugs is a list of alternative elements rather than alternative means, then we would apply the modified categorical approach to determine which of the listed drugs supported Garcia's prior conviction. If that drug were marijuana, then the prior conviction is a "felony drug offense" enhancing the present sentence. If that drug were salvia, then the prior conviction is not a "felony drug offense" and does not enhance the present sentence.

So the ultimate question is whether Indiana's statute is divisible. Federal courts defer to state courts on the issue of whether a state statute is divisible. *Mathis*, 136 S. Ct. at 2256 ("This threshold inquiry—elements or means?—is easy in this case, as it will be in many others. Here, a state court decision definitively answers the question … ."). A state supreme court

decision on point generally controls. But reliance on a state intermediate court decision is appropriate in the absence of a decision from the State's highest court or a compelling reason to think the highest court would disagree with the intermediate decision. *Mathis* itself does not require a federal court to look only to the decisions of the State's highest court. Indeed, we recently looked to an Indiana Court of Appeals decision for the "most authoritative guidance" regarding the scope of particular Indiana drug crimes for purposes of determining whether that scope fell within the Armed Career Criminal Act's definition of a "serious drug offense." *United States v. Williams*, 931 F.3d 570, 576 (7th Cir. 2019) (discussing *Hyche v. State*, 934 N.E.2d 1176, 1179 (Ind. Ct. App. 2010)).

Here, decisions by Indiana's Supreme Court and Court of Appeals show the statute is not divisible. *See Duncan v. State*, 412 N.E.2d 770, 775–76 (Ind. 1980); *Everroad v. State*, 570 N.E.2d 38, 54 (Ind. Ct. App. 1991), *rev'd in part but summarily aff'd in relevant part*, 590 N.E.2d 567, 571 (Ind. 1992); *Martin v. State*, 374 N.E.2d 543, 545 (Ind. Ct. App. 1978). The Indiana Court of Appeals decision in *Everroad* is particularly instructive. The court applied Indiana Supreme Court precedent to an older version of I.C. 35-48-4-10. Indiana charged defendants with two counts under I.C. 35-48-4-10 based on a single occurrence: one for marijuana, one for hashish. On appeal, defendants argued they could only be convicted of one count under this statute even though two drugs itemized in the statute were involved. The intermediate court applied *Duncan* and concluded possessing marijuana and hashish is only one violation of I.C. 35-48-4-10. Defendants could not be convicted of separate counts for marijuana and hashish based on the same occurrence.

The intermediate decision in *Everroad* is currently the authoritative resolution of this issue by an Indiana court. Indiana's Supreme Court has not directly addressed this issue, although its decision in *Duncan* supported the intermediate decision in *Everroad*,[2] which is clear and unambiguous. Possessing marijuana and hashish is only one violation of I.C. 35-48-4-10. Salvia stands on equal statutory footing.

Thus, the list of drugs in Indiana's statute lists alternative means of committing a single offense. So the modified categorical approach does not apply. "Marijuana, hash oil, hashish, or salvia" are not alternative elements for alternative crimes. Rather, they are alternative means of committing a single crime. Therefore, under the categorical approach, if any of these drugs in Indiana's statute are not included in the list of drugs in the federal definition of "felony drug offense," then the Indiana statute is broader than the federal definition. And if the Indiana statute is broader, then a conviction under it is not a "felony drug offense" for enhancement purposes, regardless of which drug the defendant actually dealt. As already noted, inclusion of salvia in the Indiana statute excludes it from the federal definition of "felony drug offense." Thus, Garcia's prior conviction under I.C. 35-48-4-10 is not a "felony drug offense" and does not support the sentencing enhancement here. Application of this enhancement was plain error. But this does not mean Garcia is unaccountable. He was held accountable by the state court for his prior

---

[2] The Indiana Supreme Court summarily affirmed the relevant part of the intermediate court's decision in *Everroad*. We need not evaluate whether this is more than perfect silence from the Indiana Supreme Court because reliance on an intermediate decision is legitimate absent persuasive indicia Indiana's highest court would reach a different conclusion.

conviction. We remand to the district court for resentencing without this prior conviction as an enhancer under 21 U.S.C. § 841(b)(1)(A) but we do not remove the prior conviction from the 18 U.S.C. § 3553(a) analysis. *See Portee v. United States*, 941 F.3d 263, 273 (7th Cir. 2019).

## II. PINEDA-HERNANDEZ

Pineda-Hernandez stood trial. He argues an interpreter botched the interpretation of the trial testimony of a key government witness. He argues the district judge compounded the problem by recalling the witness to testify again, the following day, with a different interpreter. He seeks remand for a new trial. In the alternative, he also appeals the imposition at sentencing of an upward adjustment based on his role.

### A. TRIAL

### 1. Day One

Pineda-Hernandez spoke little English, so the judge appointed two federally certified interpreters to assist him during trial: Claudia Rubio Samulowitz and Maria Conde-Barwise. The judge introduced them to the prospective jurors as "neutral parties serving the Court in providing an interpreting service to the Defendant in this case." (Tr. Voir Dire, DE 629, 9:13–14.) Day one, including voir dire, jury selection, and evidence, proceeded without significant problems.

### 2. Day Two

Day two also passed without significant problems. The judge asked Pineda-Hernandez if he could understand the interpreters, and he said yes.

### 3. Day Three: Barragan-Lopez testified

On the third morning of trial, the government called Miguel Barragan-Lopez to testify against Pineda-Hernandez. Barragan-Lopez was a co-defendant who pleaded guilty. According to Pineda-Hernandez, Barragan-Lopez was "heavily involved in the alleged Code Red drug-distribution ring" and was a star witness for the government ("critical" and "key"). (Pineda-Hernandez's Br., 8–9.)

Barragan-Lopez testified through Samuel Ramos, an interpreter hired by the government, not appointed by the court, and not federally certified. Before Barragan-Lopez testified, Pineda-Hernandez's counsel agreed there were no issues with Ramos's qualifications and agreed to have him interpret. So he did. The general process involved him listening to an attorney's question in English, interpreting the question into Spanish for Barragan-Lopez, listening to his Spanish response, and interpreting the response into English. The court did not record audio at trial. The court reporter did not capture any Spanish in the transcript of Barragan-Lopez's testimony (save "Si" a few times). So we have no record of all the Spanish spoken by Ramos or Barragan-Lopez. Neither party asked the court to record or transcribe the Spanish.

Barragan-Lopez testified as follows. He dealt drugs in Indianapolis in 2013, was convicted of a felony drug crime, was deported, but soon returned to the United States because he owed money to people in Mexico. In 2015 he was involved in further drug activity that lead to the charges in this case. He faced a minimum of 20 years in prison because of his prior felony drug conviction. He decided to cooperate with the government in exchange for a chance to receive a lower sentence.

Barragan-Lopez admitted that around May 2015, he entered into an arrangement with Pineda-Hernandez (also known as "Flaco") and others involving meth distribution. Barragan-Lopez testified about Pineda-Hernandez's role:

> Q    What was Flaco's role?
>
> A    What do you mean Flaco's role?
>
> Q    In this business arrangement regarding the distribution of methamphetamine, what did Flaco do?
>
> A    He received it.
>
> Q    Okay. Received it from where?
>
> A    From Mexico.
>
> Q    How do you know that?
>
> A    Because he told me that.
>
> Q    Okay. What did Niko do? I am sorry, what did Grenas do?
>
> A    Help him distribute it.
>
> Q    Okay. What did you do?
>
> A    Help Grenas and he to distribute it.
>
> Q    Now, when you talk about "he," are you referring to Flaco, the Defendant, Pineda-Hernandez?
>
> A    Yes.

(Trial Tr., DE 633, 393:6–21.)

Barragan-Lopez confirmed his testimony about Pineda-Hernandez ("Flaco") a bit later:

Q      All right. So you have told us about this distribution system where Flaco had obtained the methamphetamine. The methamphetamine was distributed down through Grenas, to you, to Big Mike, and College?

A      Yes.

Q      How much did you have to pay for a pound of methamphetamine that was provided to you by Grenas from Flaco?

A      Eight, 8,000.

(*Id.* at 396:22–397:4.)

Barragan-Lopez testified about the color of the meth he received from Pineda-Hernandez ("Flaco"):

Q      Okay. As you sit here today, do you recall the color of the methamphetamine that you received from Flaco?

A      Yes.

Q      What color was it?

A      Pinky transparent.

Q      Now, was some of the methamphetamine that you received actually white?

A      Yes.

* * *

Q      Mr. Barragan, I am going to show you what has been introduced as Government's Exhibit 14 and see if that looks like the methamphetamine or the white methamphetamine that

you would have received from Flaco through Grenas?

A        Yes.

Q        Now, you have indicated that some of the methamphetamine you received was, I believe, pinkish or red; is that what you testified to?

A        Yes.

* * *

Q        And if we look at that photograph [Exhibit 156] is that what some of that red or pink methamphetamine looked like?

A        Yes.

* * *

Q        Once again, did that pinkish or red methamphetamine that you received from Flaco through Grenas, did it look like the substance that we see here in Exhibit 158?

A        Yes.

* * *

Q        Did you learn how that reddish—or pink-ish-colored methamphetamine got to be that way as compared to being white, which we see in Exhibit No. 14?

A        Supposedly it was made up.

Q        Made up of what?

A        With Gatorade.

> Q      How do you know that?
>
> A      Because Flaco told me.
>
> Q      Did Flaco tell you that he, himself, had used the Gatorade to make the meth which caused it to turn pinkish or red?
>
> A      Yes.

(*Id.* at 403:5–404:25.)

Shortly into cross-examination, Conde-Barwise approached for a bench conference and said Ramos misinterpreted a number. The judge had defense counsel repeat the question, thereby fixing the problem right away. A little later Conde-Barwise again approached the bench and said Ramos misinterpreted a drug's name. The judge repeated the question to the witness, again fixing the problem right away.

Defense counsel elicited clarity from Barragan-Lopez regarding Pineda-Hernandez's role:

> Q      And your testimony today, under oath, is that my client, who has been known in this case as Flaco, was the head of that organization?
>
> A      Yes.
>
> Q      It was your testimony today, under oath, that he was the source of the methamphetamines?
>
> A      Yes.
>
> Q      Is your testimony today that he colored the drugs with Gatorade?
>
> A      Yes.

Q      Is your testimony today that he had a
source that was out of the country?

A      Yes.

(*Id.* at 436:17–437:4.)

Defense counsel also elicited clarity regarding the meth:

Q      So your testimony today is that you have
gotten red methamphetamine?

A      Yes.

Q      And large crystal methamphetamine?

A      Yes.

(*Id.* at 445:2–6.)

At the end of Barragan-Lopez's testimony, the judge asked the jury if it had any questions for this witness. It did not.

According to Pineda-Hernandez, Barragan-Lopez was a star government witness because he testified about the structure of the criminal enterprise, identified Pineda-Hernandez as a central figure, and described tension between members of the ring. Pineda-Hernandez argues Ramos's interpretation during this key testimony was ineffective. Outside the jury's presence, during the lunch recess after Barragan-Lopez finished testifying, the two court-appointed interpreters told the attorneys and judge about errors in Ramos's interpretations. Samulowitz said most of the omissions were at the end of sentences. She said there were many differences in meaning that were not crucial, but they started to accumulate. She said, "[N]ot all the sentences made sense at one point or another in Spanish. When we noticed great differences in meaning, we

felt the need to interfere … ." (*Id.* at 451:13–16.) Samulowitz recommended a federally certified interpreter take over.

The judge quickly understood the interpretation was potentially problematic. She asked if Samulowitz or her colleague, Conde-Barwise, could take over interpreting. They agreed. She asked the parties if they accepted. They did. Then the judge asked counsel, "[D]o you want us to recall Mr. Barragan-Lopez to reexamine him?" (*Id.* at 452:25–453:1.) Before receiving an answer, the judge asked Samulowitz for examples of misinterpretations. After explaining that she could not give many details, Samulowitz gave only one example:

> The question was, "When did the Defendant get out of the car?" The translation should have, should have been "as soon as the car stopped," and it was something like, "as much as he could stand up." Which, if you translate that into English it makes sense, but when you say it in Spanish, it doesn't. That is the best example this interpreter can give at this point, but there were a lot of omissions, Your Honor, towards the end of every, of every question, of every answer back into English or questions into Spanish. There was—it was obvious that the ability to retain the information for the whole question was not there because every question kept being interrupted to "chunk it," as we say.

(*Id.* at 454:22–455:9.) The judge pressed Samulowitz for more examples, but she had none. She deferred to her colleague, Conde-Barwise, who gave two examples.

One, Conde-Barwise noted the prosecutor asked the witness about drugs he received from Pineda-Hernandez *through* Niko, but Ramos interpreted the question into Spanish as received from Pineda-Hernandez *or* Niko. Conde-Barwise said this was just one example of numerous similar errors.

Two, she noted interpretation problems regarding testimony about distribution: "When [the prosecutor] was asking him about how the distribution process went or how they had different levels into distribution, distribution channel, I noted that he omitted parts and that he was not clear in the end how the distribution was made." (*Id.* at 457:10–15.)

Without waiting for the parties to answer her question about whether to recall the witness (and without either party asking to recall the witness) the judge *sua sponte* decided to recall him: "I think it is important that we recall him. I am just making that decision. So we will recall him." (*Id.* at 457:16–18.) As the discussion continued, Conde-Barwise emphasized that Ramos omitted two to three words at the end of every question. The prosecutor asked the judge whether she would strike Barragan-Lopez's first day of testimony.[3] The judge said she was not striking it. She said she would "tell the jury the funny thing called the truth, that there was an issue about the translation, and so the court-appointed interpreters are going to interpret his testimony." (*Id.* at 461:15–18.)

The judge asked defense counsel about bringing the witness back the next day. Defense counsel said that was acceptable. Discussion ensued about the process for interpreting the witness the next day. The prosecutor invited Pineda-

---

[3] The prosecutor did not ask the judge to strike the testimony, but merely asked whether the judge would strike the testimony.

Hernandez to waive any objections he might have to any interpretation errors. Pineda-Hernandez declined to waive. His attorney said, "He does not waive any translation errors. He would like for the witness to come back tomorrow." (*Id.* at 471:5–6.)

Pineda-Hernandez did not object to recalling the witness and having one of the court-appointed interpreters interpret. The judge asked, "I just want to confirm for the record that you have no objection to the process the Court has outlined where we will recall the witness and have one of the Court interpreters serve as the interpreter?" And defense counsel said, "No objection, Your Honor." (*Id.* at 505:9–13.)

### 4. Day Four: déjà vu

Day four opened with the prosecutor raising three issues outside the presence of the jury.

One, the prosecutor argued the examples given by the two court-appointed interpreters of purported erroneous interpretations were sparse and immaterial. And one of the examples involving a dispute over whether the question concerned marijuana on one hand or methamphetamine and heroin on the other was not a misinterpretation but merely an instance of people hearing different things, the prosecutor argued.

Two, the prosecutor argued "the unspecified allegations of widespread translation errors" left only two options: either recall Barragan-Lopez to re-testify with a new interpreter or Pineda-Hernandez could waive any interpretation errors that might have occurred and the case would stand on the witness's testimony as elicited on day three.

Three, the prosecutor stated his understanding that the judge was not making any finding about whether there were

interpretation errors. The prosecutor noted Ramos had not commented on the allegations of errors, had been unable to hear the interpretations made by the court-appointed interpreters to Pineda-Hernandez during trial, and might defend his interpretations as exactly right.

Defense counsel stated Pineda-Hernandez was not waiving any rights. The judge confirmed she was not making any finding that Ramos's interpretations were inaccurate. The judge noted that defense counsel had agreed to Ramos's qualifications. The judge explained her decision to recall Barragan-Lopez. She told Pineda-Hernandez that if he agreed that Barragan-Lopez could re-testify, then the jury would hear his testimony twice, and Pineda-Hernandez would waive any error in the fact that the witness testified twice. The judge asked Pineda-Hernandez if he wanted to proceed with the witness's testimony as elicited the day before or if he wanted the witness to be recalled. Pineda-Hernandez responded through Conde-Barwise: "I have made the decision that I would like to hear the testimony … of this witness … . And I would not like to waive any right to any appeal. And so I would like for that witness to testify today." (Trial Tr., DE 634, 517:2–6.) The judge replied that by making that choice, Pineda-Hernandez was waiving the right to complain on appeal that the witness testified twice. But Pineda-Hernandez persistently insisted he was not waiving anything:

> What I am saying, it was not my problem. It was not an issue for my attorney. I think this was an issue that came up that no one was planning for it to happen, and let me say this again, I do not want to waive my right. But let me say again— let me say it again, you have the last word. Do

> as you deem fit. I would like for him to testify
> again.

(*Id.* at 517:16–21.) The judge did not press further for a waiver. She directed another interpreter, Elizabeth Sanchez, to remain with Pineda-Hernandez and interpret for him so Samulowtiz and Conde-Barwise could work as a team to provide interpretation services for the witness.

The jury entered. The judge instructed it that an issue had been raised about the accuracy of Barragan-Lopez's testimony the prior day, that the judge could not determine that issue because she was not fluent in Spanish, and that the parties agreed Barragan-Lopez will testify again with a different interpreter. The judge did not strike the witness's prior testimony. Neither party asked her to. Nor did Pineda-Hernandez seek a mistrial. Referencing the movie *Groundhog Day*, the prosecutor began the repeat direct examination of the witness. Barragan-Lopez testified again about his prior felony drug crime, deportation, illegal re-entry, further drug activity leading to the charges in this case, and decision to cooperate with the government. Again he admitted that around May 2015, he entered into an arrangement with Pineda-Hernandez and others involving meth distribution. The prosecutor asked Barragan-Lopez about what Pineda-Hernandez did:

> Q      And in that arrangement, what did Flaco do?
>
> A      He was in charge.
>
> Q      Okay. What else did he do?
>
> A      He would call, for instance, he would call me so I could make arrangements with Grenas.

Q      To do what?

A      Transactions with ice.

Q      And is "ice" another name for metham-
phetamine?

A      Yes.

Q      Where did the ice or the methampheta-
mine come from?

A      From Mexico.

Q      And who obtained it from Mexico?

A      In Flaco or in Grenas.

Q      What was your role in the arrangement?

A      Helping them sell it.

(*Id.* at 541:15–542:4.)

The prosecutor asked about financing:

Q      [Y]ou told us that there was metham-
phetamine or ice that you were receiving that
came from Grenas and came from Flaco. How
much did you have to pay for that ice?

A      8,000.

Q      Okay. And $8,000 for what quantity?

A      Per pound.

(*Id.* at 544:18–24.)

The prosecutor asked about the distribution chain:

Q      [W]as that methamphetamine that had
been imported from Mexico?

A     Yes.

Q     And who imported the methampheta-
mine from Mexico?

A     I don't know.

Q     Okay. And when it was—who delivered
the methamphetamine to you?

A     Grenas.

Q     And did Grenas tell you from where he
had obtained the methamphetamine that he was
delivering to you?

A     From Flaco.

Q     Okay. Did Flaco ever deliver metham-
phetamine to you?

A     He would send it to me with Grenas.

(*Id.* at 546:9–21.)

The prosecutor asked about the color of the meth:

Q     And how many total pounds of metham-
phetamine do you believe you received between
May and August of 2015?

A     Between 7 and 8.

Q     Okay. Now, as you sit here today, do you
recall the color of the methamphetamine that
you received to distribute to your customers?

A     Yes.

Q     What color was it?

A    It was pinkish, between pinkish and red—and red, and the other one was translucent.

* * *

Q    If we take a look at the photograph which is Government's Exhibit No. 156, is this—does this depict, or does this show what some of that red methamphetamine looked like?

A    Yes.

Q    Okay. And if we go to Exhibit No. 158, please, and does some of that pinkish or red methamphetamine that you received look like the substance which we see here in Government's Exhibit 157?

A    Yes.

Q    All right. Now, did you come to learn how this pink or red methamphetamine got to be pink or red as compared to the translucent color which we see in Government's Exhibit 14?

A    Yes.

Q    Okay. And how was that?

A    They would do it with Gatorade.

Q    Okay. Who would do it with Gatorades?

A    Flaco.

Q    How do you know that?

A    Because he told me so.

(*Id.* at 551:16–553:17.)

The prosecutor elicited further testimony regarding Barragan-Lopez's methamphetamine sources:

> Q    Now, so far we have been talking about this conflict with the methamphetamine that you believed had come from Grenas but had really come from Flaco. Now, at this same time, were you receiving some methamphetamine separately from Grenas?
>
> A    Yes.

(*Id.* at 574:15–20.)

On cross-examination, defense counsel again elicited clarity from Barragan-Lopez about Pineda-Hernandez's role:

> Q    Your testimony, under oath, is that my client was the source for the methamphetamines originally; is that correct?
>
> A    Yes.
>
> Q    Is your testimony that he colored it with Gatorade?
>
> A    Yes.
>
> Q    Is your testimony today that Grenas, or he is also known in this case as Niko, delivered all the methamphetamines to you?
>
> A    Yes.

(*Id.* at 588:17–25.)

At the conclusion of Barragan-Lopez's testimony on day four, the judge again asked the jury if it had any questions for him. Again, it did not.

At the end of day four, the judge and attorneys discussed jury instructions. The judge asked if the instructions should say anything special about Barragan-Lopez's testimony. The judge leaned against it. She did not notice any substantive differences between the two rounds: "I did not discern any difference, maybe some nuanced differences but nothing substantive. So I would prefer to maybe not even draw any attention to it … ." (*Id.* at 680:2–6.) Both attorneys agreed there was no need for a special instruction on point. Neither attorney ever asked to strike Barragan-Lopez's day-three testimony.

**5. Day Five**

But on day five, the prosecutor proposed a jury instruction noting Barragan-Lopez testified twice because an issue was raised about the accuracy of the interpretation of his first testimony, instructing the jury not to give any extra weight to his testimony because he testified twice, and telling the jury to evaluate his testimony in accordance with the instructions. Defense counsel agreed to include that instruction, so the judge gave it to the jury after closing arguments. The jury deliberated and returned a verdict of guilty on both counts.

**6. Analysis**

Pineda-Hernandez raises three issues on appeal regarding the alleged interpretation debacle.

One, did the inaccurate interpretation of a key government witness violate Pineda-Hernandez's due process rights?

Two, did the district judge abuse her discretion by recalling this witness for a second day of testimony, especially when she did not strike the first, gravely misinterpreted day of testimony?

Three, did the judge abuse her discretion by failing to use resources and procedures available under the Court Interpreters Act?

### i. lost in translation

Pineda-Hernandez complains of widespread interpretation inaccuracies during Barragan-Lopez's testimony on day three. But Pineda-Hernandez only points to three examples.

First: the alleged misinterpretation of the prosecution's English question about drugs received from Pineda-Hernandez *through* Niko (also known as "Grenas") into Spanish to the witness as received from Pineda-Hernandez *or* Niko.

Second: the alleged interpretation omissions and lack of clarity regarding distribution.

Third: the alleged color discrepancies.

The government argues Pineda-Hernandez waived the misinterpretation claims by endorsing the court's remedy of recalling the witness. We disagree. Pineda-Hernandez plainly and repeatedly said he was not waiving anything. In the alternative, the government urges forfeiture and plain-error review of the misinterpretation claims because Pineda-Hernandez did not object below. Again, we disagree. Counsel for both parties told the judge after the lunch recess on day three that the court-appointed interpreters raised interpretation errors. Defense counsel told the judge, "they said it was throughout and it was so great that they didn't want to continue but they wanted to bring it to our attention … ." (Trial Tr., DE 633, 450:22–24.) This amounts to an objection.[4] In the

---

[4] *See Stone v. Morris*, 546 F.2d 730, 736 (7th Cir. 1976) ("The purpose of Rule 46 is to inform the trial judge of possible errors so that he may have

absence of waiver or forfeiture, the government concedes we review due process challenges to trial interpretations *de novo*.

A defendant is denied due process when "the accuracy and scope of a translation at a hearing or trial is subject to grave doubt … ." *United States v. Cirrincione*, 780 F.2d 620, 634 (7th Cir. 1985). The "basic constitutional inquiry" when determining the competency of interpretation is "whether any inadequacy in the interpretation made the trial fundamentally unfair." *United States v. Leiva*, 821 F.3d 808, 820 (7th Cir. 2016) (quoting *United States v. Joshi*, 896 F.2d 1303, 1309 (11th Cir. 1990)). Mere interpretation "hiccups" do not create grave doubt. *Leiva*, 821 F.3d at 820. An interpretation need not be verbatim to be constitutionally sound if it "reasonably conveys the intent or the idea of the thought spoken." *United States v. Gonzalez*, 319 F.3d 291, 296 (7th Cir. 2003) (quoting *United States v. Zambrana*, 841 F.2d 1320, 1337 (7th Cir. 1988)).

Pineda-Hernandez argues the grave misinterpretation of the testimony rose to the level of structural error. Structural errors "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence … .'" *Neder v. United States*, 527 U.S. 1, 8–9 (1999) (quoting *Rose v. Clark*, 478 U.S. 570, 577–78 (1986)). Structural errors require automatic reversal, and are immune to harmless-error review.

---

the opportunity to consider his rulings and to correct them if necessary. Normally that purpose can be adequately served only by the making of an objection on the record, but if the court and the other litigants know what action a party desires the court to take, the purpose of the rule is served. In such circumstances a formal objection is not required, and the failure of the court to take the desired action may be asserted as error on appeal." (internal citation omitted).)

As for the claim of widespread error throughout the inter-pretations, we do not see evidence of it. We compared Bar-ragan-Lopez's testimony on day three to his testimony on day four. The questions and answers on the two days did not ex-actly mirror each other, but that seems to be a function of the slightly different approaches. A comparison of the two days does not support the claim there was significant widespread error on day three. Pineda-Hernandez has never claimed any interpretation problems regarding Barragan-Lopez's testi-mony on day four. Using day four as a referential Rosetta Stone, we do not see indicia of significant widespread inter-pretation errors on day three. Pineda-Hernandez has the bur-den to support his claim of widespread error, but he has not done so.

As for the particular instances of alleged misinterpreta-tions, they did not violate Pineda-Hernandez's right to due process. Pineda-Hernandez only alleges three specific inter-pretation errors: *through* versus *or*, testimony regarding distri-bution, and testimony regarding color.

First, Conde-Barwise said Ramos interpreted the prosecu-tor's English question ("a question," "the question") about drugs "that you received from Flaco *through* Grenas" into Spanish for the witness as "that you received from Flaco *or* Grenas." (Trial Tr., DE 633, 457:1–6, emphasis added.) Conde-Barwise did not identify this question with more specificity. She only pointed to this happening once. But the transcript shows the prosecutor asked the witness twice on day three about meth he "received from Flaco through Grenas." The prosecutor showed an exhibit and asked if it looked like the white meth "that you would have received from Flaco through Grenas?" The witness said, "Yes." (*Id.* at 403:17–21.)

Then the prosecutor showed an exhibit depicting more meth and asked "did that pinkish or red methamphetamine that you received from Flaco through Grenas, did it look like the substance that we see here in Exhibit 158?" Again, the witness said, "Yes." (*Id.* at 404:8–12.)

Pineda-Hernandez argues this allegedly grave misinterpretation is a constitutional problem because it concerns "how the Code Red conspiracy *procured drugs for sale*—the very thrust of the case … ." (Pineda-Hernandez's Br., 25.) He also argues the witness's misinterpreted testimony about Pineda-Hernandez's role in the conspiracy was inconsistent with the witness's testimony on recall the next day. (*Id.* at 30.)

But there is no constitutional problem here. On day three, as noted above, the prosecutor elicited clarity from Barragan-Lopez regarding the procurement and distribution process: "So you have told us about this distribution system where Flaco had obtained the methamphetamine. The methamphetamine was distributed down through Grenas, to you, to Big Mike, and College?" "Yes." (Trial Tr., DE 633, 396:22–397:1.) And on day four's direct examination, as noted above, Barragan-Lopez confirmed that Grenas delivered the meth to Barragan-Lopez, that Grenas said he got it from Pineda-Hernandez, and that Pineda-Hernandez would send the meth to Barragan-Lopez with Grenas. (Trial Tr., DE 634, 546:14–21.)

Moreover, as shown above, defense counsel also elicited clarity about Pineda-Hernandez's role while cross-examining Barragan-Lopez on day three. The witness confirmed it was his testimony Pineda-Hernandez "was the head of that organization," "was the source of the methamphetamines," "colored the drugs with Gatorade," and "had a source that was out of the country." (Trial Tr., DE 633, 436:17–437:4.) Pineda-

Hernandez does not point to any problems with the interpretations during this exchange. And defense counsel elicited similar clarity from this witness on day four: he confirmed Pineda-Hernandez "was the source for the methamphetamines originally" and "he colored it with Gatorade." The witness confirmed Grenas "delivered all the methamphetamines" to the witness. (Trial Tr., DE 634, 588:17–25.) So even if Ramos misinterpreted the English "through" into the Spanish for "or" twice—which is more than Conde-Barwise claims—the error was corrected by numerous other questions and answers which clarified that Pineda-Hernandez was the source of the methamphetamine.

Second, Conde-Barwise raised a problem she called "more generic." She said when the prosecutor asked about the distribution process, Ramos omitted parts and it was not clear in the end how distribution occurred. But, again, a comparison of the testimony over two days does not reveal significant interpretation errors in this regard. And both attorneys, on both days, elicited ample clarification.

Third, Pineda-Hernandez argues Barragan-Lopez's testimony about the meth color changed when his interpreters did. No interpreter raised a problem on the record regarding the color testimony. It seems Pineda-Hernandez's only basis for claiming a problem regarding the color testimony is his claim that the testimony changed from day three to day four. But it did not change significantly.

On day three the witness divided the meth into two categories: colored and white. Specifically, as noted above, he testified some meth was "[p]inky transparent" (Ramos's interpretation of answer into English), "pinkish or red" (prosecutor's English question, eliciting affirmation), "red or pink"

(ditto), "reddish—or pink-ish-colored" (ditto), and "red" (defense counsel's English question, eliciting affirmation). And he testified some meth was "white" (prosecutor's English questions, eliciting affirmation).

On day four the witness divided the meth into the same two categories. He testified some meth "was pinkish, between pinkish and red—and red" (Conde-Barwise's interpretation of answer into English), "red" (prosecutor's English question, eliciting affirmation), "pinkish or red" (ditto), and "pink or red" (ditto). And he said some meth was "translucent" (Conde-Barwise's interpretation of answer into English).

We fail to see any significant difference between day three's "[p]inky transparent," "pinkish or red," "red or pink," "reddish—or pink-ish-colored," and "red" versus day four's "pinkish, between pinkish and red—and red," "red," "pinkish or red," and "pink or red." Each day's palette carried the same nuances in hue, typical of Picasso's Rose Period. There is no reason to think Ramos made any interpretation errors in this regard. The other interpreters did not even claim he did. Indeed, the clearest, boldest statement of "red" during Barragan-Lopez's testimony on day three—remember, the concern is about whether Pineda-Hernandez fits into the "Code Red" conspiracy—came during defense counsel's cross-examination of the witness. Moreover, if there were any ambiguity about Barragan-Lopez's testimony about meth color, or any indication his testimony about color on day three did not match his testimony on day four because of misinterpretations, defense counsel had a chance to clarify the issues on cross-examination of the witness on day four. But she asked no questions about meth color during this opportunity, other than to confirm the witness's testimony that Pineda-

Hernandez colored the meth with Gatorade. This was probably because there was no significant ambiguity or misinterpretation regarding the witness's testimony about meth color.

In sum, no widespread or particular interpretation errors deprived Pineda-Hernandez of due process.

### ii. total recall

Pineda-Hernandez argues the judge abused her discretion by recalling Barragan-Lopez for a second day of testimony, especially when she did not strike his first, gravely misinterpreted day of testimony. We already determined any errors in interpretation during the first day of testimony were harmless. But when the court-appointed interpreters raised their concerns on day three, the judge, not fluent in Spanish, could not determine the extent of any problem. So she decided to recall the witness. This helped ensure the jury would not rely on tainted testimony. And it revealed the witness's testimony on day three was not tainted, or at least not substantially or significantly tainted. As the judge recognized, the testimony on both days was essentially the same: "I did not discern any difference, maybe some nuanced differences but nothing substantive." (Trial Tr., DE 634 at 680:2–4.)

Pineda-Hernandez argues recalling the witness gave the government two bites at the apple, and the first session was practice. Pineda-Hernandez argues the witness's testimony differed between the two days. In particular, when on day three the government asked "what did Flaco do?" the witness responded "He received it," referring to meth. But when the government asked the same question the next day, the witness responded "He was in charge." But there was other testimony on day three that Pineda-Hernandez was in charge.

On day three's cross-examination, as noted above, Barragan-Lopez testified Pineda-Hernandez "was the head of that organization" and "was the source of the methamphetamines" (defense counsel's English words, eliciting affirmation).

As another example of a difference between the two days, Pineda-Hernandez points to the testimony regarding meth color. He argues the testimony on day four more closely tracked the government's theory and theme of the "Code Red" prosecution than did the testimony on day three. But we already explained there was no significant variation in the color testimony between the two days.

The mere hearing of the witness twice was not problematic because the judge instructed the jury not to give extra weight to the twice-told tale. Pineda-Hernandez agreed to this instruction. We presume the jury followed it. *United States v. Marchan*, 935 F.3d 540, 548 (7th Cir. 2019). Pineda-Hernandez has not rebutted this presumption. We also think it significant the jury never asked about Barragan-Lopez's testimony. It did not ask any questions of the witness after his testimony on day three or after his testimony on day four. Nor did it ask the court any questions about his testimony as it deliberated.

The judge did not abuse her discretion or otherwise err in recalling the witness.

### iii. Court Interpreters Act

Pineda-Hernandez argues the judge abused her discretion by failing to use resources and procedures available under the Court Interpreters Act. In particular, Pineda-Hernandez faults the judge for allowing a non-federally certified interpreter for Barragan-Lopez. But the problem for Pineda-Hernandez here is he agreed to have the non-federally certified

interpreter on day three, and he accepted the interpreter's qualifications. The judge did not abuse her discretion by allowing the non-federally certified interpreter, accepted by Pineda-Hernandez, to interpret on day three. Besides, the judge cured any error here by recalling the witness. Pineda-Hernandez also faults the judge for not recording audio of the trial. But he never asked her to record it. And she had no reason to think a recording of day three was necessary. She did not abuse her discretion by not recording the trial.[5]

### 7. Conclusion

The alleged interpretation debacle involves no reversible error. Pineda-Hernandez's claims of grave, widespread misinterpretations are unsubstantiated. The few particulars he points to are insignificant at most. The recall was not ideal, but it made the best of a potentially difficult situation.

### B. LEADERSHIP ENHANCEMENT AT SENTENCING

The guidelines provide a four-level upward adjustment for a defendant who "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The guidelines also provide a 2-level upward adjustment for a defendant who "was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)." *Id.* § 3B1.1(c).

At sentencing, the judge applied the § 3B1.1(a) adjustment to count I and the § 3B1.1(c) adjustment to count II. The result

---

[5] Neither party seems to have asked the court reporter if she recorded any audio during the trial, or if the computer-aided transcription process documented any Spanish. Certainly neither party provides us with any evidence of this nature. We decline to pursue these leads on our own.

for each count was an adjusted offense level of 42. Without the enhancements, the guidelines ranges would have been 235 to 293 months for count I and 292 to 365 months for count II (subject to a statutory maximum of 20 years for count II). But with the enhancements, the guidelines range for each count was 360 months to life (subject to the statutory maximum for count II). The judge imposed a below-guidelines sentence of 300 months on count I concurrent with 240 months (the statutory maximum) on count II.

Pineda-Hernandez challenges the application of the leadership enhancement.[6] We review fact findings tied to a guidelines enhancement for clear error. *United States v. Collins*, 877 F.3d 362, 363 (7th Cir. 2017). "Whether a defendant exercised a managerial role in the charged offense is a factual determination that we review under the clearly erroneous standard." *United States v. Hall*, 101 F.3d 1174, 1176 (7th Cir. 1996). A fact finding is clearly erroneous only if, after reviewing the

---

[6] Pineda-Hernandez certainly challenges the leadership enhancement for count I. It was not clear from his initial appellate brief whether he also challenged the leadership enhancement for count II. Sometimes he referred to "enhancements" in the plural, but sometimes to "enhancement" in the singular. He did at least specifically mention the enhancement for count II, but he did not seem to make specific arguments about it. The government responded that it appeared Pineda-Hernandez was not challenging the leadership enhancement regarding count II. And the government argues that even without the leadership enhancement for count I there was no prejudice to Pineda-Hernandez because the offense level would be 42 anyway because count II reached that level and Pineda-Hernandez did not challenge it. In reply, Pineda-Hernandez does not explicitly say he is also challenging the leadership enhancement for count II, he does not dispel the government's suggestion that he is not challenging it, and he does not address the 42-anyway argument. But either way, he would still lose.

evidence presented below, we are left with the definite and firm conviction a mistake has been made. *Id.* at 1177. Pineda-Hernandez concedes clear-error review applies.

An organizer or leader "exercised some degree of control over others involved in the commission of the offense" or was "responsible for organizing others for the purpose of carrying out the crime." *United States v. Wasz*, 450 F.3d 720, 730 (7th Cir. 2006) (quoting with modifications *United States v. Carson*, 9 F.3d 576, 585 (7th Cir. 1993)). Crimes might involve multiple organizers and leaders. And a defendant might qualify for the enhancement even if he does not exercise complete dominion over every member of the enterprise at all times. *See United States v. Mustread*, 42 F.3d 1097, 1103 (7th Cir. 1994) ("Thus, at a minimum, a defendant must have had some real and direct influence, aimed at furthering the criminal activity, upon one other identified participant."); *United States v. Brown*, 944 F.2d 1377, 1385 (7th Cir. 1991) ("Section 3B1.1 requires the exercise of some authority in the organization, the exertion of some degree of control, influence, or leadership."). A defendant might qualify for the enhancement even if he did not pull all the strings all the time. *See Mustread*, 42 F.3d at 1104 (Others need not "have played marionette to the defendant's puppeteer. For these purposes, to control another the defendant may simply have organized or in some way directed him.").

Pineda-Hernandez makes colorable arguments he was not the leader or organizer. But these arguments do not overcome the bulk of the evidence showing he exercised some significant control and was responsible for some significant organization of others. We are not left with anything close to a definite and firm conviction a mistake has been made.

**III. CONCLUSION**

Garcia's prior conviction cannot enhance the mandatory minimum for his sentence. We VACATE Garcia's sentence and REMAND for resentencing.

Regarding Pineda-Hernandez, we AFFIRM.